UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NNEKA PAPILLION, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-01762-S |
| | § | |
| CONCHO COUNTY HOSPITAL | § | JURY TRIAL DEMAND |
| DISTRICT, DISCOVERY MEDICAL | | |
| NETWORK, INC., BARBARA | § | |
| BOWMAN, ELIZABETH EURESTE, | | |
| ANITA AGUILAR. | § | |
| *Defendants*. | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

### I.    INTRODUCTION

Plaintiff Nneka Papillion ("Plaintiff' or "Dr. Papillion"), files this First Amended Petition against Joint Employer Defendants Concho County Hospital District ("CCHD") and Discovery Medical Network, Inc. ("DMN") (collectively, "Joint Employer Defendants"); and against Individual Defendants Barbara Bowman ("Ms. Bowman"), Elizabeth Eureste ("Ms. Eureste"), and Anita Aguilar ("Ms. Aguilar") ("Individual Defendants") (all collectively referred to as "Defendants"), and would respectfully show the Court as follows:

### II.    PARTIES

1.    Plaintiff, Dr. Papillion, is an individual who resides in Texas.

2.    Defendant CCHD is an entity organized under the laws of Texas, located at 614 Eaker Street Eden, Texas 76837. Counsel for CCHD has consented to waiver of service, and service of process is therefore not at issue.

3.    Defendant DMN is a Texas nonprofit corporation with its principal place of business located at 1500 Broadway, Suite 1000 Lubbock, TX 79401. DMN may be served by and through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201, or wherever they may be found.

4.    At all relevant times, Joint Employer Defendants operated as joint employers of Dr. Papillion, employing her as the Chief Medical Director, Physician, and Hospitalist for the clinic and hospital in Eden, Texas, and sharing equal responsibility for all functions related to her employment, including payroll, benefits, and Human Resources.

5.    Defendant Ms. Bowman, a Caucasian female, is an individual who served as the interim Chief Executive Officer ("CEO") of CCHD and worked in Texas during the time period relevant to this lawsuit. She may be served with process at 521 Burnt Tree Lane, Apopka, Florida, or wherever she may be found.

6.    Defendant Ms. Eureste, a Hispanic female, is an individual who served as a Board of Director ("BoD") of CCHD and worked in Texas during the time period relevant to this lawsuit. She may be served with process at 306 N. Main Street, Eden, Texas 76837, or wherever she may be found.

7.    Defendant Ms. Aguilar, a Hispanic female, is an individual who served as a BoD of CCHD and worked in Texas during the time period relevant to this lawsuit. She may

be served with process at 314 Welch Street, Eden, Texas 76837, or wherever she may be found.

### III.   JURISDICTION AND VENUE

8.   This Court has jurisdiction over this action pursuant to 28 USC 1331, because Plaintiff's claims arise under federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., 42 U.S.C. § 1981, and, in the alternative as to CCHD, 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367, because such claims are so related to the federal claims that they form part of the same case or controversy.

9.   Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### IV.   STATEMENT OF FACTS

10.   Dr. Papillion is a distinguished, board-certified female physician who served as Chief Resident during her medical residency.

11.   Dr. Papillion is a United States citizen.

12.   Dr. Papillion is African American, of Nigerian descent, and has light brown skin. At all times relevant to the claims herein, Defendants were aware of her race, national origin, and skin tone.

13.   In or around July 2019, Joint Employer Defendants contracted to employ Dr. Papillion as Chief Medical Director and Physician for the Concho Medical Clinic located in Eden, Texas.

14.  Around that same time, Joint Employer Defendants also contracted to employ Dr. Papillion as a Hospitalist for the Concho County Hospital in Eden, Texas.

15.  In detrimental reliance on the promise of stable, non-discriminatory, and non-retaliatory employment with Joint Employer Defendants, Dr. Papillion declined other employment offers, and, alongside her husband, relocated over 600 miles from Fayetteville, Arkansas, to Eden, Texas.

16.  As part of an investment in Dr. Papillion's role as a prominent and long-term figurehead in the clinic's success, she was provided with company-sponsored housing, including a budget allocated for home renovations.

17.  Joint Employer Defendants further committed to fully paying off Dr. Papillion's six figure student loan debt.

18.  In exchange, Dr. Papillion utilized her medical expertise to transform a vacant plot of land into a fully functional medical facility she oversaw, with industry standard process flows.

19.  Dr. Papillion intently spearheaded the creation of the clinic, including curating its layout, handpicking the wall hues, selecting custom furnishings and fixtures, hiring medical product vendors, ordering quality medical supplies, overseeing equipment installation, coordinating clinical workflows, and ensuring the facility met all healthcare compliance and operational standards—guided by and in alignment with her registered medical license.

20.  Eden, Texas is a rural town with a severely limited population of African Americans, if any.

21. Dr. Papillion was responsible for overseeing the daily operations of the clinic and hospital, including supervising staff and maintaining compliance with healthcare regulations and standards, through her registered medical license.

22. After Dr. Papillion accepted the roles and relocated, Brian Lady ("Mr. Lady"), a Caucasian male and CCHD's CEO at the time, informed her that Mary Castanuela ("Ms. Castanuela"), a BoD at the time, told him "a black would never make it in Eden, Texas."

23. Mr. Lady assured Dr. Papillion that, despite Ms. Castanuela being a racist, she had no power or authority to disrupt the work environment.

24. Dr. Papillion was prominently featured on a large billboard in the town, displaying her face, likeness, and clinic affiliation, which served as the primary introduction to her for many patients and members of the community.

25. Dr. Papillion was regarded as a valued figure in the community and routinely organized health fairs that offered free medical checkups and resources to local residents.

26. Dr. Papillion's exceptional leadership as a frontline medical professional during the unprecedented COVID-19 pandemic, combined with her unwavering commitment to the community, directly led to her appointment as County Medical Commissioner of Eden, Texas, in September 2020.

27. Dr. Papillion successfully continued all of her many roles simultaneously.

28. In September 2022, after more than three years of dedicated service to the clinic and community—including investing in a home, contributing to local health initiatives, fostering long-term patient relationships, and serving in a public leadership role—Dr.

Papillion shared the news that she was expecting her first child, solidifying her deep-rooted connection and long-term commitment to remaining in Eden, Texas.

29. Defendants were dissatisfied with Dr. Papillion's decision to have a child at a time when the clinic and hospital were experiencing steady growth and increasing demands.

30. Ms. Bowman, an affiliate of Joint Employer Defendants—who later became the interim CEO—directly questioned Dr. Papillion's decision to have a child while her career was thriving, urging her to reconsider.

31. Despite being a first-time mother, Dr. Papillion remained fully committed to her work, continuing her duties until just a week or so before giving birth in September 2022.

32. Pursuant to the terms of Dr. Papillion's employment agreement, she took maternity leave from September 2022 through January 2023.

33. During her maternity leave, Dr. Papillion was contacted several times regarding issues with the locum tenens physician covering her practice, Dr. Rebecca Burson ("Dr. Burson"), a Caucasian female.

34. On multiple occasions, while postpartum and still recovering, Dr. Papillion had to meet with Dr. Burson for hours to address numerous errors and deficiencies that could have jeopardized the clinic, hospital, and Dr. Papillion's medical license.

35. Dr. Burson was not meeting the requirements for continued medical education and was at risk of having her own medical license suspended.

36. While Dr. Papillion was on maternity leave, Mr. Lady and other medical staff repeatedly contacted her, urging her to return early due to the disruptions caused by Dr. Burson's handling of the practice.

37. Dr. Papillion returned to work in January 2023, following her maternity leave.

38. Dr. Papillion's husband agreed to quit his job to care for their newborn as there was limited and questionable childcare in Eden, Texas.

39. Upon returning from maternity leave, Dr. Papillion's practice was severely compromised.

40. As Dr. Papillion continued to attempt to restore the practice and correct the errors caused by Dr. Burson, Ms. Aguilar began recruiting others, including Ms. Eureste, and Ms. Castanuela to heavily scrutinize and criticize her.

41. BoD members, primarily led by Ms. Aguilar and Ms. Eureste, began blaming Dr. Papillion for the financial shortcomings caused by Dr. Burson.

42. At no time did BoD members, including Ms. Aguilar and Ms. Eureste, scrutinize Dr. Burson or her work, though she was blatantly underperforming.

43. Neither Ms. Aguilar, Ms. Eureste, or Ms. Castanuela are physicians.

44. Neither Ms. Aguilar, Ms. Eureste, nor Ms. Castanuela hold a college degree, related to medicine or healthcare.

45. Ms. Castanuela was a BoD at the beginning of Dr. Papillion's tenure and though she stepped down not too long after, she continued to collude with Ms. Aguilar and Ms. Eureste to promote division between them and Dr. Papillion.

46. Ms. Aguilar and Ms. Eureste were at all times BoDs who applied for the roles and were appointed by the local community, with no regard to education or healthcare qualifications.

47. Dr. Papillion spoke to Mr. Lady about these concerns verbally multiple times, but Ms. Aguilar and Ms. Eureste continued to create a hostile work environment.

48.  Due to Ms. Aguilar and Ms. Eureste's escalated hostility towards Dr. Papillion, in June 2023, Dr. Papillion formally documented her concerns and emailed her complaint to Mr. Lady who sent them to representatives of Joint Employer Defendants, including Mark Havins ("Mr. Havins")—Vice President and Partner of DMN at the time.

49.  In response, Mr. Lady acknowledged the complaint and stated that he would take action to address the issues raised.

50.  Dr. Papillion never received any further communication or follow-up from either representative of Joint Employer Defendants regarding the status of her complaint.

51.  In the same month, Dr. Papillion also raised concerns regarding hospital pharmacist Hasnain Hashmi ("Mr. Hashmi")—a Pakistani man—maliciously deleting patient prescriptions she sent to the pharmacy, which he dishonestly claimed he never received.

52.  A neutral and impartial investigation was never conducted as it was later revealed in September 2023 by the pharmacy tech, Heather Womack—a Caucasian woman—that Mr. Hashmi had in fact been deleting Dr. Papillion's patient prescriptions for months, unchecked, placing her medical license and patient vitality in jeopardy.

53.  Because Dr. Papillion raised a complaint, Ms. Aguilar and Ms. Eureste intensified their scrutiny, continuing to undermine her medical opinion in both professional and public settings.

54.  Due to the biased work environment created by the BoDs, including Ms. Aguilar and Ms. Eureste, Dr. Papillion's employment evaluations were reassigned to a third-party Human Resources entity to ensure impartiality and neutrality.

55. In August 2023, Mr. Lady left the company, and Ms. Bowman was appointed as the interim CEO.

56. In August 2023, the hospital BoDs at the time, including Ms. Aguilar and Ms. Eureste, permitted local residents to live stream board meetings via Facebook.

57. During those live streamed board meetings, hospital BoDs, including Ms. Aguilar and Ms. Eureste, openly spoke negatively about Dr. Papillion—and her practice—to local residents.

58. Hospital BoDs, including Ms. Aguilar and Ms. Eureste, began posting negative comments on the saved Facebook live stream videos, further defaming Dr. Papillion.

59. Hospital BoDs, including Ms. Aguilar and Ms. Eureste, began revealing personal and confidential information about and related to Dr. Papillion in open session, versus closed session—including patient data, her salary, and home address—under the guise of the Freedom of Information Act.

60. Hospital BoDs, including Ms. Aguilar and Ms. Eureste, dishonestly shared false information with local residents about how many patients Dr. Papillion had seen at that time, the amount of community health affairs she held, the amount of free health checkups she completed, and other hospital data.

61. Hospital BoDs, including Ms. Aguilar and Ms. Eureste, shared Dr. Papillion's salary with local residents, critiquing her compensation in comparison with the false data they shared with local residents.

62. Hospital BoDs, including Ms. Aguilar and Ms. Eureste, actively turned local residents Dr. Papillion had been successfully treating for years against her.

63. In August 2023, fueled by the actions of BoDs, including Ms. Aguilar and Ms. Eureste, local residents were incited with a sense of entitlement, leading one patient to trespass onto Dr. Papillion's residence, aggressively demanding to see her.

64. Taken aback while still undergoing postpartum tensions, Dr. Papillion, fearing for her and her family's safety, filed a police report.

65. In August 2023, with malicious intent, Ms. Eureste began spreading false rumors amongst Dr. Papillion's patients stating she was "taking her baby and going back to her country."

66. In August 2023, Ms. Aguilar began maliciously driving through the hospital parking lot improperly surveying Dr. Papillion's patients to attempt to influence them to make negative statements about their medical appointments.

67. Dr. Papillion repeatedly spoke with Ms. Bowman about the hostile work environment, but Ms. Bowman failed to take any meaningful action to resolve the issues.

68. Instead, knowing there were high tensions in the community because of the BoDs' intentions to defame Dr. Papillion, Ms. Bowman attempted to sabotage Dr. Papillion by requesting to post her photo on the clinic Facebook page "for advertisement."

69. In September 2023, the hospital BoDs made the discussion of Dr. Papillion's employment contract an agenda item, for further scrutiny and criticality by local residents.

70. In September 2023, with Mr. Lady no longer being employed with the company, Dr. Papillion submitted her second formal complaint—among multiple informal complaints—to representatives of Joint Employer Defendants, including Ms. Bowman

and Jacqueline Webb ("Ms. Webb"), DMN's liaison—who routed the complaint to Mr. Havins—regarding the ongoing hostile work environment and lack of resolution.

71. In response, Ms. Bowman acknowledged the veracity of Dr. Papillion's concerns, thanked her for her valued contributions, but claimed there was nothing she could do about the behaviors of the BoDs, because it was "out of her control."

72. That same evening, during a board meeting live streamed on Facebook, tensions between hospital BoDs and local residents escalated into a heated altercation that ultimately resulted in police intervention.

73. Following the incident, Ms. Bowman contacted Dr. Papillion and admitted she was fearful of what might unfold next. She informed Dr. Papillion that she was flying back to Florida—abandoning the situation and leaving Dr. Papillion to face the escalated threats alone.

74. Facing an intolerable and dangerous work environment that threatened not only her safety but also her medical license—with no meaningful intervention from leadership—Dr. Papillion, fearing for the well-being of her husband and newborn, was constructively discharged on October 2, 2023, just days after the altercation.

75. Dr. Papillion had no behavioral issues.

76. Dr. Papillion had no performance issues.

77. Dr. Papillion had no attendance issues.

78. She was regarded as a high performing employee.

79. Having relocated from another state in reliance on the position and housing provided by the hospital, Joint Employer Defendants abruptly left Dr. Papillion without income, housing, or security.

80. Joint Employer Defendants did not find it necessary to address the BoDs regarding decorum, presentation, and confidentiality at board meetings until November 2023 when Trent Krienke ("Mr. Krienke"), CCHD's counsel, was forced to address it due to disclosure risks.

81. This occurred after Dr. Papillion was constructively discharged, having endured months of being targeted at board meetings, creating an intolerable and unsafe environment.

82. Since Dr. Papillion's constructive discharge, multiple complaints and resignations have followed, undergoing the hostile work environment she was subjected to.

83. Dr. Papillion was replaced by a Caucasian male physician.

84. Dr. Papillion was also treated less favorably than her non-Black counterparts, in the terms, conditions, and privileges of her employment, despite her distinguished qualifications and performance.

85. Individual Defendants and their allies within the community have continued to defame Dr. Papillion through ongoing statements and commentary, further damaging and causing continuing injury to her reputation.

## V.    CONDITIONS PRECEDENT

86. Pursuant to the workshare agreement between the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC"), Plaintiff has satisfied all conditions precedent to filing this lawsuit and has filed this action within ninety (90) days of receiving the Notice of Right to Sue. Plaintiff timely filed her dual Charge of Discrimination (the "Charge") shortly after the underlying violations, and the Charge remained pending the assignment of an

investigator for nearly two years until she requested and received her Notice of Right to Sue ("NRTS").

## VI.    CAUSES OF ACTION

### COUNT I: RACE DISCRIMINATION AND HARASSMENT UNDER 42 U.S.C. § 1981

87.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

88.    Individual Defendants, acting in concert and under color of their respective authority as duly appointed members of the Board of Directors and as the interim CEO of CCHD, discriminated against Plaintiff because of her race and subjected her to harassment and a hostile work environment by demeaning, humiliating, ostracizing, sabotaging, and intimidating her through persistent and targeted actions, all of which posed serious risks to her well-being and professional safety. Their conduct included replacing Plaintiff with a Caucasian male physician and treating her less favorably than her non-Black counterparts in the terms, conditions, and privileges of employment, despite her distinguished credentials and performance.

89.    Individual Defendants are directly liable for their discriminatory and harassing conduct. Defendant DMN is vicariously liable for the acts of Individual Defendants whose conduct directly affected the terms and conditions of Plaintiff's joint employment with Defendant DMN, and for the conduct of its own named officers and employees who, despite being made aware of the discrimination and harassment, failed to intervene or take corrective action, thereby ratifying and acquiescing in the misconduct.

90.  To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

91.  Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

### COUNT II: RETALIATION UNDER 42 U.S.C. § 1981

92.  Plaintiff hereby repeats and realleges the allegations in each of the paragraphs as if fully set forth herein.

93.  Plaintiff engaged in protected activity under 42 U.S.C. § 1981 when she opposed and reported race-based discrimination multiple times, informally and formally. In response, Individual Defendants undertook retaliatory measures, including escalating harassment, undermining Plaintiff's professional standing, and perpetuating a hostile environment, the cumulative effect of which culminated in Plaintiff's constructive discharge.

94.  Individual Defendants are directly liable for their retaliatory conduct. Defendant DMN is vicariously liable for the retaliatory acts of Individual Defendants, whose conduct directly impacted the terms and conditions of Plaintiff's joint employment with Defendant DMN, and for the conduct of its own officers and employees who, despite being placed on notice of Plaintiff's protected activity and the retaliatory actions taken against her, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the retaliation.

95. To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

96. Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT III: RACE, COLOR AND NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

97. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

98. Plaintiff was subjected to discrimination because of her African American race, Nigerian national origin, and light brown skin tone. The discriminatory conduct, carried out by Individual Defendants in their roles at CCHD, included persistent acts of demeaning, humiliating, ostracizing, sabotaging, and intimidating Plaintiff, culminating in her constructive discharge. Plaintiff was replaced with a Caucasian male physician and treated less favorably than her non-Black counterparts in the terms, conditions, and privileges of employment, despite her qualifications and performance.

99. Defendant DMN, as Plaintiff's joint employer under Title VII, is vicariously liable for the conduct of Individual Defendants and directly liable because its own officers and agents, despite being placed on notice of the discrimination, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the hostile environment.

100. To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

101. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

**COUNT IV: SEX AND PREGNANCY DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

102. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

103. The discriminatory conduct carried out by Individual Defendants in their roles at CCHD included questioning Plaintiff's decision to have a child, subjecting her to heightened scrutiny and harassment during her pregnancy, forcing her to work while on maternity leave, pressuring her to return prematurely from such leave, and, upon her return, undermining her professional role by holding her responsible for conditions caused by a replacement physician. These actions collectively created intolerable conditions and culminated in her constructive discharge.

104. Defendant DMN, as Plaintiff's joint employer under Title VII, is vicariously liable for the conduct of Individual Defendants and directly liable because its own officers and agents, despite being placed on notice of sex and pregnancy-based discrimination, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the hostile environment.

105. To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

106. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT V: HARASSMENT AND HOSTILE WORK ENVIRONMENT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

107.  Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

108.  Plaintiff was subjected to a hostile work environment. The harassing conduct carried out by Individual Defendants in their roles at CCHD included demeaning comments, heightened scrutiny, intimidation tactics, exclusion, belittlement, and public humiliation, both in professional settings and through social media broadcasts, all of which posed serious risks to Plaintiff's well-being and professional safety.

109.  Defendant DMN, as Plaintiff's joint employer under Title VII, is vicariously liable for the conduct of Individual Defendants and is directly liable because its own officers and agents, despite being placed on notice of the harassment, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the hostile environment.

110.  To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

111.  The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT VI: RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

112.  Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

113. Plaintiff engaged in protected activity under Title VII when she opposed and reported race, national origin, sex, and pregnancy-based discrimination, both informally and through formal complaints.

114. In response, the Individual Defendants undertook retaliatory measures, including escalating harassment, heightened scrutiny, public disparagement, and undermining Plaintiff's professional standing, all of which created intolerable working conditions and culminated in her constructive discharge.

115. Defendant DMN, as Plaintiff's joint employer, is vicariously liable for the retaliatory conduct of Individual Defendants, and is directly liable because its own officers and agents, despite being placed on notice of Plaintiff's protected activity and the ensuing retaliation, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the retaliation.

116. To the extent Defendant CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads this claim in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

117. The foregoing actions and omissions were willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT VII: DISABILITY DISCRIMINATION UNDER AMERICAN WITH DISABILITIES ACT OF 1990, AS AMENDED

118. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

119. Plaintiff was subjected to discrimination carried out by Individual Defendants in their roles at CCHD, including heightened scrutiny and adverse treatment during her pregnancy, the imposition of stress and unreasonable demands during her maternity

leave, and intensified hostility and undermining of her role upon her return. This conduct created intolerable conditions that culminated in Plaintiff's constructive discharge and simultaneously imposed undue stress and health risks during her pregnancy and postpartum period, endangering both her well-being and that of her newborn child.

120. As Plaintiff's joint employer, Defendant DMN is vicariously liable for the conduct of Individual Defendants and directly liable because its own officers and agents, despite being placed on notice of the pregnancy-based discrimination, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the misconduct.

121. To the extent CCHD meets its burden of establishing that it is a state actor entitled to immunity, Plaintiff pleads in the alternative under 42 U.S.C. § 1983, as set forth more fully in Count XI.

122. Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under federal law.

## COUNT VIII: COMMON LAW DEFAMATION

123. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

124. Individual Defendants, as well as members of the Board of Directors and leadership, knowingly made, and continue to make, false and defamatory statements about Plaintiff to third parties, including local residents and patients, with the intent to damage Plaintiff's reputation and undermine her professional standing.

125. These false statements were made without privilege and with actual malice and a reckless disregard for the truth.

126. Individual Defendants are directly liable for their defamatory conduct. As Plaintiff's joint employer, Defendant DMN is vicariously liable for the conduct of Individual Defendants and directly liable because its own officers and agents, despite being placed on notice of the false and defamatory statements, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the misconduct.

127. To the extent CCHD does not meet its burden of establishing that it is a state actor entitled to immunity, it is likewise liable for the conduct of its officers and agents, including its Board Members and interim CEO, whose defamatory acts were undertaken in their official capacities and under the authority of CCHD.

128. As a direct and proximate result of Individual Defendants' defamatory statements, Plaintiff suffered irreparable and ongoing damages, including reputational injury, emotional distress, and economic loss.

129. Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under Texas common law.

### COUNT IX: COMMON LAW BREACH OF CONTRACT

130. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

131. Plaintiff entered into valid and enforceable employment agreements with Joint Employer Defendants, which included, among other terms, the provision of company-sponsored housing, loan repayment benefits, and stable employment under non-discriminatory conditions. Plaintiff fully performed her obligations under these agreements by relocating, establishing, and operating the clinic and hospital facilities in reliance on Joint Employer Defendants' promises.

132. Joint Employer Defendants are directly liable for breaching these agreements by capitalizing on Plaintiff's medical license and her successful creation of the clinic, then depriving her of the promised company-sponsored housing—which she had personally renovated—revoking her loan repayment benefits, and allowing Individual Defendants to create an intolerable and demeaning work environment that placed her medical license at serious risk.

133. As a direct and proximate result of these breaches, Plaintiff suffered substantial financial, professional, and reputational harm.

134. The conduct of Joint Employer Defendants was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under Texas common law.

**COUNT X: COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

135. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

136. Individual Defendants, acting intentionally and with reckless disregard, orchestrated a campaign of extreme and outrageous conduct that manifested in the public humiliation of Plaintiff through social media broadcasts and commentary, the malicious dissemination of false rumors impugning Plaintiff and her family, the unlawful disclosure of confidential and private information, trespass to her property, and the deliberate incitement of community hostility that placed Plaintiff and her family in fear for their safety. This campaign was not merely calculated to injure Plaintiff's professional reputation, but was deliberately designed and executed to drive Plaintiff and her family from the very community in which she lived, worked, and served—and it succeeded.

137. Individual Defendants are directly liable for their extreme and outrageous conduct. As Plaintiff's joint employer, Defendant DMN is vicariously liable for the conduct of Individual Defendants and directly liable because its own officers and agents, despite being placed on notice of the false and defamatory statements, failed to intervene or take corrective measures, thereby ratifying and acquiescing in the misconduct.

138. To the extent CCHD does not meet its burden of establishing that it is a state actor entitled to immunity, it is likewise liable for the conduct of its officers and agents, including its Board Members and interim CEO, whose extreme and outrageous conduct was undertaken in their official capacities and under the authority of CCHD.

139. This extreme and outrageous conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under Texas common law.

### COUNT XI: COMMON LAW PROMISSORY ESTOPPEL

140. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

141. To the extent any written or enforceable contract is not found to govern the promises at issue, Plaintiff pleads in the alternative that Joint Employer Defendants recruited Plaintiff based on her distinguished credentials and made clear and definite promises, including assurances of stable employment, company-sponsored housing, and repayment of her student loan debt, in order to induce her reliance. In reasonable and detrimental reliance on these promises, Plaintiff and her husband uprooted their lives by relocating over 600 miles, investing in and renovating the company-sponsored home, and fully performing in accordance with Joint Employer Defendants'

agreements. Defendant DMN is directly liable for breaching promises on which Plaintiff reasonably relied to her detriment.

142. To the extent CCHD does not meet its burden of establishing it is a state actor entitled to immunity, it is likewise liable.

143. It was foreseeable to Joint Employer Defendants that Plaintiff would undertake these substantial actions in reliance on their promises. Yet, after securing the benefits of Plaintiff's services and reputation, Joint Employer Defendants repudiated their assurances and allowed her medical license and professional standing to be jeopardized through discrimination, retaliation, and harassment.

144. As a direct result, Plaintiff suffered, and is still suffering, severe harm to her career, health, and financial stability.

145. Joint Employer Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under Texas common law.

## COUNT XII: VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

146. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

147. At all relevant times, Individual Defendants, acting in their official capacities as members of the Board of Directors and interim leadership of CCHD, exercised authority and acted under color of state law.

148. To the extent Defendant CCHD meets its burden of classification as a state actor entitled to immunity, CCHD and Individual Defendants, acting in their official capacities, exercised that authority to discriminate, retaliate, and harass Plaintiff on the basis of her race, color, national origin, sex, pregnancy, and disability, and to defame,

disparage, and endanger her through public broadcasts, social media, rumors, disclosures of confidential information, and incitement of community hostility. This course of conduct deprived Plaintiff of equal protection and the rights secured to her by the Constitution and federal law, and created intolerable conditions that compelled her constructive discharge.

149. Both CCHD and the Individual Defendants are directly liable for depriving Plaintiff of her constitutional rights under color of state law.

150. As a direct and proximate result of these constitutional violations, Plaintiff not only suffered loss of employment, but also damage to her professional reputation, financial harm, emotional distress, and displacement of her family.

151. The conduct of Individual Defendants was willful, malicious, and carried out with reckless disregard for Plaintiff's constitutional rights.

## VII.    DAMAGES

152. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

153. Defendants' actions violated 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981, 42 U.S.C. § 12101 et seq. and, to the extent Defendant CCHD is deemed a state actor, 42 U.S.C. § 1983. Plaintiff is entitled to recovery of back pay, front pay, and pre-judgment and post-judgment interest.

154. Plaintiff is also entitled to compensatory damages under 42 U.S.C. § 1981, 42 U.S.C. § 1981a(a)(1) and 42 U.S.C. § 1981a(a)(2).

155. Because Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages pursuant to 42 U.S.C. § 1981a(b)(1), to the extent permitted by law.

156. Plaintiff further seeks damages available under Texas law, including but not limited to:

   a) Expectation damages arising from Defendants' breach of contract, or in the alternative, reliance damages flowing from Defendants' breach of promises giving rise to promissory estoppel;

   b) Reputational and emotional harm resulting from Defendants' defamatory statements; and

   c) Severe emotional distress and related harms arising from Defendants' extreme and outrageous conduct.

157. Plaintiff seeks all damages and remedies available under federal and state law.

## VIII.    ATTORNEYS' FEES AND COSTS

158. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

159. Plaintiff retained the services of undersigned counsel to prosecute her claims.

160. Plaintiff is entitled to recovery of reasonable attorneys' fees, expert fees, and costs to the fullest extent permitted by law.

## IX.    RESPONDEAT SUPERIOR

161. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

162. Joint Employer Defendants are vicariously liable for the acts and omissions of their agents, representatives, employees, servants, and officers, all of whom acted within the course and scope of their employment and/or agency at all relevant times. To the extent CCHD is deemed a state actor, its liability arises under 42 U.S.C. § 1983 as set forth herein.

## X.  INJUNCTIVE AND DECLARATORY RELIEF

163. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

164. Plaintiff respectfully requests that the Court enter appropriate injunctive and declaratory relief, including but not limited to:

a) Prohibiting Defendants from engaging in further unlawful discrimination and retaliation;

b) Requiring Defendants to implement and report compliance measures to the Court to ensure adherence with any final order issued herein;

c) Declaring that Defendants violated Plaintiff's rights under federal and state law, including but not limited to Title VII, Section 1981, the Americans with Disabilities Act, 42 U.S.C. § 1983 (in the alternative as to CCHD), and relevant state tort and equitable doctrines to which the Court has jurisdiction;

d) Awarding court costs; and

e) Granting such other and further equitable relief as the Court deems just and proper.

## XI.    PRESERVATION OF EVIDENCE

165.    Defendant is hereby placed on notice that all documents, materials, and electronically stored information ("ESI") that constitutes as evidence or is relevant to any issue in this case must be preserved in its current form and condition until the conclusion of this litigation.

## XII.    JURY DEMAND

166.    Plaintiff hereby demands a trial by jury on all issues of fact and damages set forth herein.

## XIII.    PRAYER

167. Plaintiff respectfully requests that Defendants be cited to appear and answer, and that upon final trial, the Court enter judgment in Plaintiff's favor and award the following relief:

   a)   Back pay and front pay, including lost benefits;

   b)   Compensatory damages;

   c)   Punitive damages against Defendants for whom such relief is authorized by law;

   d)   Injunctive and declaratory relief, including but not limited to, an Order:

      i. Prohibiting Defendants from engaging in further unlawful discrimination and retaliation;

      ii. Requiring Defendants to report to the Court regarding compliance with any final order issued herein;

      iii. Declaring that Defendants violated Plaintiff's rights under federal and state law, including but not limited to Title VII, Section 1981, the

*Papillion v. Concho County Hospital District, et. al* – First Amended Petition                    Page **27** of **28**

ADA, Section 1983 (in the alternative as to CCHD), and relevant state tort and equitable doctrines to which the Court has jurisdiction;

e) Awarding court costs;

f) Pre-judgment and post-judgment interest at the rate set by law; and

g) All legal or equitable relief this Court deems proper.

Respectfully Submitted,

*/s/ Marshay Iwu*
Marshay Iwu
State Bar No. 24083204
marshayiwu@lawyersdemandingjustice.com
**IWU & ASSOCIATES**
400 South Zang Boulevard, Suite 1200
Dallas, Texas 75208
Telephone: 469-804-9721
Facsimile: 214-272-3186

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On September 26, 2025, I hereby certify that I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically using the CM/ECF filing system.

*/s/ Marshay Iwu*
Marshay Iwu